# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

JOSEPH HOLLEY, *et. al.*,           )
                                    )      Case No.: 2:24-cv-01629-GMN-DJA
            Plaintiffs,             )
                                    )   **ORDER DENYING PRELIMINARY**
       vs.                          )   **INJUNCTION AND STAY OF BIA**
                                    )              **DECISION**
THE UNITED STATES DEPARTMENT OF )
THE INTERIOR, BUREAU OF INDIAN      )
AFFAIRS, *et. al.*,                 )
            Defendants.             )
_____)

Pending before the Court is the Motion to Stay Undated Decision from Director of the Bureau of Indian Affairs and the Motion for Preliminary Injunction[1], (ECF Nos. 10, 13), filed by Plaintiffs Joseph Holley and Te-Moak Tribe of Western Shoshone Indians of Nevada[2]. Defendants the United States Department of the Interior ("Interior"), Bureau of Indian Affairs ("BIA") and Bryan Mercier,[3] Acting Director of the BIA, filed a Response, (ECF Nos. 21), wherein Defendants ask this Court to stay this Court's proceedings. Plaintiffs filed a Reply, (ECF Nos. 24, 26). Also pending before the Court is third-party intervenor, Steven McDade's Motion to Intervene, (ECF No. 29). The Court heard oral argument on the pending motions on

---

[1] The two pending motions before the Court, ECF Nos. 10 and 13, are identical and both request the same two remedies: (1) to stay the BIA Decision or (2) issue a preliminary injunction. In the interest of consistency, the Court will only cite to the Motion for Preliminary Injunction, ECF NO. 13, but the decision applies to both.

[2] Because the Director's Decision recognizes the Garcia-Ike Council as the interim Tribal Council, the Court is not persuaded that Holley has standing to bring this suit on behalf of the Te-Moak Tribe of Western Shoshone Indians of Nevada, as the Tribe is currently led by the Garcia-Ike Council and not the Holley Council. Holley's standing, however, is not in question. Because the Parties do not argue whether Holley has standing to bring this suit on behalf of the Tribe, the Court refers to the filing parties' arguments as "Plaintiffs."

[3] Bryan Mercier was appointed to replace Darryl LaCounte as Director of the BIA. (Wakeland Decl. ¶ 26, Ex. A to Resp., ECF No. 21-1). The successor of a public official who is a party to an action is automatically substituted as a party if the named official no longer holds office while the action is pending. Fed. R. Civ. P. 25(d).

October 4, 2024. Afterwards, third-party intervenor, Te-Moak Tribe Housing Authority filed a Motion to Intervene, (ECF Nos. 32, 33).

The Court **GRANTS** both Motions to Intervene. (ECF Nos. 32, 33).  Because Plaintiffs have not demonstrated that all Winter factors are met for a preliminary injunction, or that a stay of the administrative proceedings is proper, the Court **DENIES** Plaintiffs' Motion to Stay Undated Decision from Director of the Bureau of Indian Affairs and the Motion for Preliminary Injunction.  The Court **GRANTS** Defendants' Motion to Stay these federal court proceedings.

## I.    BACKGROUND

This case arises out of Plaintiffs' request for judicial review of an undated[4] Decision issued by the Director of BIA, on June 20, 2024 (the "Decision").  The Te-Moak Tribe of Western Shoshone Indians of Nevada (the "Tribe") is a federally recognized Indian tribe headquartered in Elko, Nevada. (Compl. ¶ 7, ECF No. 7).  The Tribe is composed of four constituent bands: the Battle Mountain Band, Elko Band, South Fork Band, and Wells Band. (*Id.*).  The Tribe's Constitution states that the "executive and legislative powers of the Tribe shall be vested in a Tribal Council. . . and in Band Councils, one Band Council for each constituent Band of the Tribe." (Te-Moak Tribe Const. art. 4 § 1, Ex. 6 to App. to Mot. Prelim. Inj., ECF No. 14-6).  The Tribal council "consist[s] of eight (8) members; four (4) from Elko, two (2) from Battle Mountain and two (2) from South Fork selected from and by the membership of each of the respective Band Councils. (*Id.* art. 4, § 2(a)).  Band Council elections must be held the second week of October every three years and elections for each Band must be held on the same day. (*Id.* art. 7, § 1); (Election Ordinance §13-4-1, §13-4-2(a), Ex. 7 to App. to Mot. Prelim. Inj., ECF No. 14-7).  Band Councils must be composed of seven elected members. (Te-Moak Tribe Const. art. 4, § 11(a), Ex. 6 to App. to Mot. Prelim. Inj.).

---

[4] The June 20, 2024, decision was issued without a date.  Upon notification of that fact, the Director re-issued the decision, with date, on July 18, 2024. (Wakefield Decl. ¶ 15, Ex. A to Resp., ECF No. 21-1).

But there is a mechanism in place for filling vacant Band Council seats. (Election Ordinance §13-4-2, Ex. 7 to App. to Mot. Prelim. Inj.).  Band Councils must hold a monthly meeting. (*Id.* art. 4, § 19(a)).

After the completion of Band Council elections, each Band Council must "select its representatives to the Tribal Council and certify their names to the Tribal Council within fourteen days after the Band Council elections." (*Id.* art. 11, § 2).  Then a subsequent election for Tribal Chairperson "is held from among those elected to the Tribal Council." (*Id.* art. 4, § 2(c)).  The Tribal Chairperson is voted on "by the registered voters of the Tribe who cast ballots in a tribal election." (*Id.*).  The election for Tribal Chairperson must "be held within 21 days after the Band Council elections." (*Id.* art. 7, § 3).  Importantly, any registered voter of the Tribe may file a dispute concerning the election with the Band Election Committee or Tribal Election Board within 24 hours of a Band or Tribal election. (Election Ordinance §13-10-1, Ex. 7 to App. to Mot. Prelim. Inj.).  Properly lodged disputes are heard before the Band Election Committee or Tribal Election Board and the reviewing body determines whether the election was valid or invalid. (*Id*).  Decisions of the Band Election Committee or Tribal Election Board are final. (*Id.*).

**A. The 2021 Band Elections**

The Tribe has been entangled in an intra-tribal dispute over the membership of its Tribal Council and the makeup of its Tribal judiciary since the last Tribal election cycle in October 2021. (BIA Decision at 1, Ex. 2 to App. to Mot. Prelim. Inj., ECF No. 14-2).  In October 2021, only three Bands held Band Elections: Elko, Wells, and South Fork. (*Id.* at 2).  The Elko Band election was certified, and the elected members were subsequently sworn in. (*Id.*).  The Wells Band election was not certified, and the South Fork Band election was disputed and determined invalid by one Tribal judge and valid by another. (*Id.* at 3.). Battle Mountain Band did not conduct elections in October 2021. (BIA Decision at 3, Ex. 2 to App. to Mot. Prelim. Inj.).

1    The South Fork Band swore-in its elected members in December 2021 and there is

2    record that a Tribal Chairman Election took place in January 2022. (*Id.*)  Vince Garcia was won

3    this election with the most votes and Denena Ike received the second most votes. (*Id.*).  But

4    also in December 2021, the Holley Council passed a resolution declaring that the Band

5    elections conducted in October were invalid because not all Bands held elections on the same

6    day. (*Id.* at 4). The resolution required new elections to take place in February 2022 which not

7    all Bands followed. (*Id.*).

8        Since the 2021 election cycle, there are two groups claiming authority as the purported

9    Tribal Council. (Compl. ¶¶ 24–38); (BIA Decision at 1, Ex. 2 to App. to Mot. Prelim. Inj.).

10   Plaintiff Joseph Holley served as the Tribal Chairperson from 2018–2021 and claims that his

11   council, the Holley Council, should be presently recognized as the valid Tribal Council because

12   a constitutionally valid Tribal election did not occur in 2021. (Compl. ¶ 2–3); (BIA Decision at

13   2, Ex. 2 to App. to Mot. Prelim. Inj.).  The other faction purporting to be the valid Tribal

14   Council is the Garcia-Ike Council, led by Danena Ike after Vince Garcia passed away in

15   January 2024. (Compl. ¶¶ 2–3); (BIA Decision at 5, Ex. 2 to App. to Mot. Prelim. Inj.).  In

16   addition to the competing Tribal Councils, there are two individuals who claim to be tribal

17   court judges. (BIA Decision at 5, Ex. 2 to App. to Mot. Prelim. Inj.).  Because of these internal

18   divisions, there was no clearly identifiable Tribal council for BIA to recognize for the purposes

19   of conducting government-to-government relations, including discussions about legal and

20   financial responsibilities. (*Id.*).

21   **B. The 2023 Regional Director's Decision**

22       On October 17, 2023, The Regional Director for the Western Regional Office of the

23   Bureau of Indians Affairs recognized Danena Ike as the Tribal representative for the purpose of

24   "execut[ing] contracts with the federal Government on behalf of the Te-Moak Tribe." (BIA

25   Decision at 19, Ex. 2 to App. to Mot. Prelim. Inj.); (*see also* Reg'l Dir. Decision at 12, Ex. 18

to App. to Mot. Prelim. Inj., ECF No. 14-18).  The Regional Director's decision recognized Ike "as the Tribe's representative for ninety days from the date of [the Regional Director's] decision or until establishment of a Tribal Council, whichever occurred first." (Reg'l Dir. Decision at 12, Ex. 18 to App. to Mot. Prelim. Inj.).  The "recognition [was] required to allow the United States to continue necessary government-to-government relations with the Tribe" and "[was] not to be construed a general recognition for all Tribal purposes." (*Id.*).  Three parties appealed the Regional Director's October 2023 decision to the BIA Director automatically staying the Regional Directors Decision. (BIA Decision 9–10, Ex. 2 to App. to Mot. Prelim. Inj.).  Significantly, neither Holley nor any member of his council filed an appeal of the Regional Director's decision, despite it being adverse to their position in the matter. (BIA Decision 10, Ex. 2 to App. to Mot. Prelim. Inj.); (Wakeland Declaration ¶ 10–11, Ex. A to Resp., ECF No. 21-1).

### C. The 2024 BIA Director's Decision

On June 20, 2024, the BIA Director issued an order vacating the Regional Director's decision. (BIA Decision at 30, Ex. 2 to App. to Mot. Prelim. Inj.).  The BIA Director "decline[d] to affirm the Regional Director's decision to recognize Ms. Ike as the sole tribal representative authorized to entreat with the United States." (*Id.*).  The BIA Director called attention to the Tribe's leadership structure which ensures each Band is represented on the Tribal Council and in normal circumstances, each band would be "represented in dealings with the Federal government" and oversee a tribal election. (*Id.*).  Because of this consideration, the Director felt it more appropriate to recognize a Tribal Council rather than a sole representative. (*Id.*).  Thus, the Director recognized the Garcia-Ike Council as "the government of the Te-Moak Tribe for purposes of conducting business with the federal government and for preparing for the next election cycle, pending the Tribe's ultimate resolution of its internal disputes via tribal mechanisms."  (*Id.* at 1–2).

1    Plaintiffs and four other parties filed administrative appeals of the Director's Decision to

2  the Interior Board of Indian Appeals ("IBIA"). (Status of Appeals of Director's Decision at 1,

3  Ex. C to Resp., ECF No. 21-3).  On September 3, 2024, the Assistant Secretary of Indian

4  Affairs assumed jurisdiction of the IBIA appeals. (*Id.*).  After filing an administrative appeal of

5  the Director's Decision, Plaintiffs filed their Complaint in this Court on September 4, 2024,

6  seeking review and reversal of the Director's Decision. (*Id.*).  On September 16, 2024, the

7  Assistant Secretary of Indian Affairs explained that the governing regulations prohibit him

8  from proceeding with administrative adjudication of the appeals of the Director's Decision until

9  Plaintiffs' "federal court challenge is either adjudicated or stayed and directed to [the Assistant

10 Secretary]." (*Id.* at 2).

11    Relatedly, the Regional Director issued another decision on July 10, 2024, concluding

12 that the "Court of Indian Offenses for the Western Region will once again exercise jurisdiction

13 over criminal and civil cases on behalf of the [Tribe] unless and until the Tribe validly re-

14 establishes a Tribal Court." (BIA Decision at 2, Ex. 2 to App. to Mot. Prelim. Inj.).  The

15 Regional Director reached this conclusion based on the Director's Decision which found that

16 neither of the two purported Tribal court judges had been validly appointed. (*Id.*).  Holley,

17 among others, appealed this Decision to the IBIA which determined that these appeals should

18 also be decided by the Assistant Secretary due to the interrelatedness of the appeals. (Order

19 Consolidating at 6, Ex. E to Resp., ECF No. 21-5).

20    Plaintiffs ultimately seek "the review and reversal" of the Decision issued by the

21 Director of the BIA on June 20, 2024.  Specific to their pending motions, they first request the

22 Court to stay the BIA Decision recognizing the Garcia-Ike Council so that they can "return to

23 the status quo as to Tribal operations, conducting business with the federal government, and

24 preparing and conducting the 2024 Tribal elections, as it existed prior to the [BIA Decision]."

25 (Pls.' Proposed Order, ECF No. 20).  The Court heard oral argument on the pending motions on

October 4, 2024.  During the Hearing, the Court GRANTED McDade's Motion to Intervene and took Plaintiffs' pending motions under submission pending a written decision on the matter.

## II.   LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).  "Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).  Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. "[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (internal quotation marks omitted).  The Ninth Circuit has additionally held that when likely success on the merits cannot be determined, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011) (internal quotation marks omitted).

The Administrative Procedure Act ("APA") states that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.  The APA further authorizes that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court. . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights

pending conclusion of the review proceedings." *Id.* § 705. "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes of action on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). "A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863 (9th Cir. 1979). The standard for seeking a stay of an administrative decision is the same as the standard for seeking a preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

## III.   DISCUSSION

Plaintiffs' instant Motion to Stay Undated Decision from Director of the Bureau of Indian Affairs and Motion for Preliminary Injunction are based on their claim for judicial review. (Mot. Prelim. Inj. 17:15–24, ECF No. 13). The Court must limit the scope of its federal jurisdiction "to the *propriety* of the BIA's action under the APA, not the *soundness* of the BIA's Decision under tribal law: "[The] resolution of such disputes involving questions of interpretation of the tribal constitution and tribal law is not within the jurisdiction of the district court."" *Alto v. Black*, 738 F.3d 1111, n.9 (9th Cir. 2013) (emphasis added) (quoting *Runs After v. U.S.,* 766 F.2d 347, 352 (8th Cir. 1985). With that in mind, the Court first takes up whether Plaintiffs have demonstrated a likelihood of success on the merits.

### A.  Likelihood of Success on the Merits

The Court finds that the likelihood of success on the merits weighs against Plaintiffs, but the Court acknowledges that Plaintiffs have presented serious question as to the merits under *Alliance for the Wild Rockies*. To demonstrate a likelihood of success on the merits, Plaintiffs must show that the BIA's Decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Congress exercises plenary authority

over Indian tribes. *U.S. v. Lara*, 451 U.S. 193, 200 (2004).  Through its plenary power, Congress has delegated the responsibility for "the management of public business relating to Indians" to the Secretary of the Interior. *See* 43 U.S.C. § 1457; *see also* 25 U.S.C. § 2.  A vital component of such management is the "responsibility for carrying on government relations with [Tribes]." *Goodface v. Grassrope*, 708 F.2d 335, 339 (8th Cir. 1983).  But importantly, the United States Supreme Court has explained that "Indian tribes retain their inherent power to determine tribal membership [and] to regulate domestic relations among members" which includes the power to determine "matters of local self-government." *Montana v. U.S.*, 450 U.S. 544, 564 (1981); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978).

It is true that "the ultimate determination of tribal governance must be left to tribal procedures." *Wasson v. Reg'l Dir.*, 42 IBIA 141, 158 (2006).  Thus, "[i]t is for a tribe, and not BIA, to elect or otherwise designate the tribe's representative(s)." *Alturas Indian Rancheria v. Acting Pac. Reg'l Dirs.*, 54 IBIA 1, 11 (2011).  But in limited circumstances, like a tribal governance dispute, the BIA may need to determine whom BIA will interact with on an interim basis so that government-to-government relations may proceed. *LaRocque v. Aberdeen Area Dir.*, 29 IBIA 201, 2023 (1996).  Specifically, "[t]he BIA, in its responsibility for carrying on government relations with [a] Tribe, is obligated to recognize and deal with some tribal governing body in the interim before resolution of [an] election dispute."[5] *Goodface,* 708 F.2d at 339; *see also* 25 C.F.R. 2.700.

The Court does not have the authority to determine which group is the governing body of the Tribe because "[d]eciding a question involving a tribal election dispute is solely a matter of tribal law." *U.S. Bancorp v. Ike*, 171 F. Supp. 2d 1122, 1125 (D. Nev. 2001) (citing *Shenandoah v. U.S. Dep't of the Interior,* 159 F.3d 708, 712–13 (2nd Cir. 1998) (holding that a

---

[5] It is important to note that the BIA did not assume authority over the Tribal election.  Rather, it recognized a Tribal government to conduct Tribal election proceedings.

1   federal court did not have jurisdiction to determine which member of the Oneida Tribe was the

2   proper tribal representative, as the question involved purely tribal law); *Rosebud Sioux Tribe of*

3   *South Dakota v. Driving Hawk,* 534 F.2d 98, 100 (8th Cir.1976) (holding that federal courts

4   cannot be used to supervise and decide issues that arise in tribal elections)).  Thus, our focus is

5   solely on the propriety of the Director's Decision by assessing whether it was "arbitrary,

6   capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.A. § 706.

7   　　　Under this standard, the Court "must consider whether the decision was based on a

8   consideration of the relevant factors and whether there has been a clear error of judgment."

9   *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), abrogated on other

10  grounds by *Califano v. Sanders*, 430 U.S. 99 (1977) (citations omitted).  The Court "is not

11  empowered to substitute its judgment for that of the agency." *Id*.  Ultimately, the Court must

12  affirm the agency decision if the agency "considered the relevant factors and articulated a

13  rational connection between the facts found and the choices made." *Ranchers Cattlemen Action*

14  *Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1115 (9th Cir.

15  2007) (citation omitted).

16  　　　Plaintiffs first argue that the Decision was unlawful because the Director exceeded his

17  authority to recognize an entire tribal government instead of an individual representative. (Mot.

18  Prelim. Inj. 19:2–4).  Defendants argue, and the Court agrees, that the Director has the authority

19  to recognize a government rather than just an individual representative. (Resp. 16:10–12, ECF

20  No. 21).  Courts have held that it is in the BIA's authority to select an interim tribal government

21  for purposes of maintaining government-to-government relations. *Goodface*, 708 F.2d at 339;

22  *Winnemucca Indian Colony v. U.S. ex rel. Dep't of the Interior*, No. 3:11-CV-00622-RCJ, 2012

23  WL 2789611 at *8 (D. Nev. July 9, 2012) (holding that "[t]he BIA shall recognize *one or more*

24  Council members as the government of the [tribe]").  Thus, the Director's Decision recognizing

25  an interim Tribal Council was not unlawful.

Moreover, Plaintiffs argue that the Director's Decision was unlawful because it was overbroad in scope and unlimited in time. (Mot. Prelim. Inj. 19:2–4).  The Director's Decision recognized the "Garcia-Ike Council. . . as the government of the Te-Moak Tribe for purposes of conducting business with the federal government and for preparing for the next election cycle, pending the Tribe's ultimate resolution of its internal disputes via tribal mechanisms." (BIA Decision at 31, Ex. 2 to App. to Mot. Prelim. Inj., ECF No. 14-2).  It is within the Director's scope of authority to help manage "public business relating to Indians." *See* 43 U.S.C. § 1457; *see also* 25 U.S.C. § 2.  A large component of managing that public business is the "responsibility for carrying on government relations with [Tribes]" which the BIA cannot do unless they know with whom to interact with. *Goodface*, 708 F.2d at 339.  The BIA Director explained that "[r]ecogntion of the Garcia-Ike Council for limited purposes will be the best way to enable government-to-government relations and to optimize the Tribe's ability to conduct fair elections in 2024." (BIA Decision at 31, Ex. 2 to App. to Mot. Prelim. Inj., ECF No. 14-2). Moreover, the Court does not agree with Plaintiffs that the Director's Decision was "unlimited in time" due to his use of the phrase "pending the Tribe's ultimate resolution of its internal disputes via tribal mechanisms." (BIA Decision at 31, Ex. 2 to App. to Mot. Prelim. Inj.).  It is clear from the record that the BIA wishes for the tribe to hold an election pursuant to tribal law, and for there to be a duly elected tribal council.  The Director explained that the "most important role for the recognized Council to perform with regard to settling this dispute with *finality* is to take all necessary actions to ensure that valid elections take place in 2024." (*Id.*). Thus, the Director's Decision was not overbroad, unlimited in time, or otherwise unlawful.

Next, Plaintiffs argue that the Director's Decision was arbitrary and capricious because it was inconsistent with itself and did not serve the interests the Director was balancing. (Mot. Prelim. Inj. 20:2–9).  Agency actions may be found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law:

if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of the agency's expertise.

*Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1067 (9th Cir. 2005) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, (1983).  Moreover, "an internally inconsistent analysis is arbitrary and capricious." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015).

Plaintiffs argue that the Director erred when he chose not to follow the precedent of recognizing the last undisputed council. (Mot. Prelim. Inj. 21:22–26).  But, the Director explained, at length, why he could not recognize Holley and his last undisputed council. (BIA Decision at 19–20, Ex. 2 to App. to Mot. Prelim. Inj.).  In support of his Decision to recognize the Garcia-Ike Council over the Holley Council, the Director explained:

> Mindful that the Government's distinctive obligation of trust includes the duty to promote a tribe's political integrity and noting that the Holley Council failed to timely schedule Band elections, failed entirely to schedule Tribal Chairman elections, and that neither Mr. Holley nor any member of his Council filed any document in this appeal, I decline to recognize the Holley Council on the basis of its "last recognized" status.

(*Id.* at 20).

Moreover, the Director's Decision thoroughly analyzed the issues presented by the parties that had properly appealed the Regional Director's decision.  The Director took up the arguments raised on appeal and offered an in-depth explanation for his decision based on the evidence before the agency at the time. (*See* BIA Decision at 9–13, 17–31, Ex. 2 to App. to Mot. Prelim. Inj.).  Plaintiffs cite to numerous exhibits as the basis for their belief that the Director's Decision was inconsistent with the interests he sought to promote. (*See e.g.*, Exs. 14-22, 14-23, 14-24, 14-27, 14-28, 14-30, 14-33).  But "the focal point for judicial review [under

the APA] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  Plaintiffs argue an exception to this rule applies and that "the Court should be permitted to review the actual evidence demonstrating the Garcia-Ike Council's fitness, or lack thereof, to serve as the government of the Tribe and prepare for the election." (Reply 13:3–4, ECF No. 24); *see E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1107 (N.D. Cal. 2018) (describing permissible exceptions).  But what Plaintiffs are asking the Court to do is at the least look at the soundness of the Director's Decision, and at most make determinations of which competing group is more fit to lead the Tribe based on Tribal law.  The Court must refrain from doing either.

However, the Court does find persuasive Plaintiffs' argument that the Director did not follow Tribal constitutional law when deciding whom to recognize on an interim basis for government-to-government matters. (Mot. Prelim. Inj. 13:1–4).  The Director acknowledged that he "has a duty to ensure that its decisions satisfy the United States Constitution, the Administrative Procedure Act, and any other applicable laws, which [the Bureau] cannot do should it unquestionably approve obvious misapplication of tribal laws." (BIA Decision at 16, Ex. 2 to App. to Mot. Prelim. Inj.).  Moreover, the BIA Director called attention to the Tribe's leadership structure which ensures each Band is represented on the Tribal Council and as such each Band, in normal circumstances, would be "represented in dealings with the Federal government" and overseeing a tribal election. (BIA Decision at 30, Ex. 2 to App. to Mot. Prelim. Inj.).  But the Garcia-Ike Council represents, at most, only one of the Tribe's four Bands which presents an inconsistency between the Director's interests sought and decision rendered.  Plaintiffs allege that the Garcia-Ike Council is composed of Danena Ike (Elko Band Council), Rhonda Hicks (not a Band Council Member), Helen Stevens (Elko Band Council), and Leah Brady (Elko Band Council). (Compl. ¶ 46., ECF No. 1).  While an individual named

1  Angie Quintana (South Fork Band Council) was also a member of the Garcia-Ike Council, she

2  resigned from her position on April 9, 2024. (Quintana Resignation Ltr. at 1, Ex. 23 to App. to

3  Mot. Prelim. Inj., ECF No. 14-23).  Thus, the Court finds that Plaintiffs have presented serious

4  questions going to the merits.

5  **B.  Irreparable Harm**

6  The Court next looks at irreparable harm and finds that this factor weighs against

7  granting Plaintiffs a preliminary injunction or stay of the Decision.  A Plaintiff who seeks a

8  stay, or an injunction must "demonstrate a likelihood of irreparable injury—not just a

9  possibility—in order to obtain preliminary relief." *Winter*, 555 U.S. at 21.  "Speculative injury

10  does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."

11  *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).  "A plaintiff

12  must do more than merely allege imminent harm sufficient to establish standing; a plaintiff

13  must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive

14  relief." *Id.*

15  Plaintiffs argue that "Tribe members face a loss of their voting rights if the Garcia-Ike

16  Council is permitted to move forward with their competing 2024 election." (Mot. Prelim. Inj.

17  24:1–2).  The Court finds that when[6] Plaintiffs announced an election date of October 8, 2024,

18  they did so in good faith because they believed they were the Tribal Council following the

19  automatic stay of the Regional Director's October 2023 decision pending review by the BIA

20  Director.  But the Garcia-Ike Council was recognized as the interim Tribal Council in June

21  2024, so the Tribe had from June to October to set the record straight on when an election

22  would take place following the recognition of the Garcia-Ike Council.  Indeed, Intervenor

23

24  ───────────────

25  [6] Plaintiffs argued at this Court's hearing that the Holley Council announced in April 2024 they had scheduled an election for Tuesday October 8, 2024.  If true, this announcement was made in good faith after the Regional Director's decision was automatically stayed pending appeal and before the BIA Director issued its June Decision.

McDade alleges the Garci-Ike Council announced their Band Council election date in July 2024. (Oct. 4, 2024, Hr'g).  It is unclear from the record why the Garcia-Ike Council decided to hold the Band Council elections on Saturday, October 12, 2024, but that is of little significance to the Court's analysis now.

To support his argument, Plaintiffs explain that "the presence of competing election dates will confuse voters and disrupt the election process, likely leaving many Tribe members disenfranchised or forced to seek a new election on the heels of judicial review." (Mot. Prelim. Inj. 24:3–5).  Plaintiffs admit that the voter rolls for the competing elections contain "basically the same voters" meaning Tribal members, as a whole, will not be disenfranchised as Plaintiffs originally claimed. (Oct. 4, 2024, Hr'g).  Moreover, a person who attempts to register to vote but is denied, has the opportunity to appeal that decision, but McDade alleges the timeline for that appeal process has somehow lapsed.[7] (Oct. 4, 2024, Hr'g); (Election Ordinance § 13-3-3, Ex. 7 to Apps. to Mot. Prelim. Inj.).  While it is troubling that both the window to register to vote and register as a candidate for the Saturday election was abbreviated, and none of the four Bands garnered a full slate of seven candidates for the seven vacancies, these issues could arise in any election and be addressed by Tribal Courts if the Tribe deemed such issues to be redressable.

The Court acknowledges that Tribal members certainly might be confused on which election to vote in but finds that this inconvenience is not irreparable because voters could vote in both elections if they wish[8].  Indeed, Intervenor McDade confirmed during the October 4, 2024, Hearing before this Court that some candidates went so far as to register to run in both

---

[7] This Court respectfully declines to elaborate on the soundness of an appellate prohibition which denies voters the right to appeal disenfranchisement.

[8] While McDade stated at the Hearing that members committing election fraud would not be allowed to vote on Saturday, this Court assumes that Tribal members voting on Tuesday would not be denied the ability to vote on Saturday, just as candidates registering for the Tuesday election were permitted to register as candidates for the Saturday election.

1    elections. (Oct. 4, 2024, Hr'g).  Intervenor McDade also explained at the Hearing that

2    interested candidates "had their right to appeal their candidacy," but the time to do so has

3    passed. (*Id.*).  Interestingly, Intervenor McDade did not receive a single appeal at any point

4    during the respective appellate timelines leading up to the October 12 election. (*Id.*)

5            Plaintiffs argue that Holley will be refused his right to vote if he chose to vote in the

6    Saturday election.  Intervenor McDade said that "it is within [his] authority to not allow

7    individuals who have committed election fraud in the past to be nowhere within the election of

8    2024." (McDade July 12, 2024, Email, Ex. 27 to Apps. to Mot. Prelim. Inj., ECF No. 14-27).

9    The Election Ordinance states that if "the Band election committee dissolves or neglects their

10   responsibilities, the Tribal Election Board will assume the Band election committee

11   responsibilities."[9] (Election Ordinance § 13-15-2, Ex. 7 to Apps. to Mot. Prelim. Inj.).  Band

12   election committees have authority to oversee their band's voter registrations, voter rolls,

13   election tallies, and election certifications. (*Id.* Chap. 3, Chap. 11).  Plaintiffs argue that what

14   will inevitably happen is that "Mr. Holley is probably going to be one of the individuals that

15   even if he voted in the Saturday election, his vote would not be counted by Mr. McDade, and

16   he would use that sole authority that he's claiming that he has. (Oct. 4, 2024, Hr'g).

17           Significant to this analysis, there is an internal dispute mechanism that Plaintiffs, and

18   other Tribal members, can use following the election if they believe it to be unlawful. (Election

19   Ordinance §13-10-1, Ex. 7 to App. to Mot. Prelim. Inj.).  Plaintiffs recognize that Tribal

20   members can appeal election results pursuant to the Tribe's Election Ordinance, which he

21   claims, "are expeditiously addressed and resolved." (Compl. ¶ 24, ECF No. 1); (Mot. Prelim.

22

23   _____

24   [9] McDade avers that the Battle Mountain Band "violated their members' rights by throwing out the members'
voter registrations and forcing the membership to register again." (McDade July 12, 2024, Email, Ex. 27 to
Apps. to Mot. Prelim. Inj., ECF No. 14-27).  Thus, he "reached out to all four bands for a registered voters list"

25   pursuant to the Election Ordinance and Tribal Constitution but "received no correspondence." (*Id.*).  It is because
of this alleged violation, among others, that McDade believes he has the authority to oversee the Band Council
elections. (*See* Election Ordinance §§ 13-3-6, 13-14-2, 13-14-3, Ex. 7 to App. to Mot. Prelim. Inj.)

Inj. 5:6–7).  Plaintiffs are wary that they will not be able to file election disputes within 24 hours of the election if it takes place on October 12, 2024, because that date is a Saturday, and the Election Board offices are closed on Sundays. (Reply 7:9–15, ECF No. 24).  But Intervenor McDade stated in the October 4, 2024, Hearing that he and his Election Committee would be available to take disputes on Sunday, October 13, the day after the election. (Oct. 4, 2024, Hr'g).  Moreover, either a Tribal Court or a Court of Indian Offenses, also known as a CFR Court,[10] exists for the Tribe and maintains a courtroom and a Court clerk in Elko, Nevada. (Beard Decl. ¶ 22, Ex. F to Resp., ECF No. 21-6).  While the status of the two court systems is a point of confusion for the Tribe while the BIA Decision is pending the Assistant Secretary's review, (Oct. 4, 2024, Hr'g), if matters concerning the adequacy of the election arose, the Tribal Court or CFR Court could address them.[11]

Additionally, Plaintiffs argue that "Ike's actions in seizing control of Tribal property, and funds, is causing irreparable harm to the Tribe." (Mot. Prelim. Inj. 24:1–2).  Plaintiffs allege that "[Danena] Ike has also resorted to outright conversion of the Tribe's property." (*Id.* 14:7).  Indeed, the Holley Council filed a Complaint with the U.S. Post Office after Ike allegedly submitted a change of address notice on July 2, 2024, to change the Tribe's mailing address to an address unaffiliated with the Tribe. (U.S. Post Office Compl. at 1, Ex. 25 to Apps. to Mot. Prelim. Inj.). Plaintiffs aver that because of the address change, much of the Tribe's mail has gone missing. (Mot. Prelim. Inj. 14:8–11).  Intervenor Te-Moak Housing Authority argues that many of their tenants pay rent by mail and their payments have gotten lost which has caused them a loss in revenue. (Te-Moak Housing Auth. Mot. Intervene 13:1–4).  But a loss in revenue is not a sufficient basis for establishing irreparable harm because an award of

---

[10] CFR Courts operate under the Department of Interior's Code of Federal Regulations. 25 C.F.R. Part 11.  Their stated purpose is "to provide adequate machinery for the administration of justice for Indian tribes [in certain areas] where tribal courts have not been established." 25 C.F.R. §11.102.

[11] A CFR Court "has civil jurisdiction over any civil action within the territorial jurisdiction of the court where the defendant is an Indian, or other claims provided at least one party is an Indian." 25 C.F.R. § 11.116.

money damages is an available remedy. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Additionally, Plaintiffs argue that on or about August 5, 2024, Ike accessed the Native American Tribal Opioids Settlement portal and changed the Tribe's bank information to an account controlled by Ike and submitted a new W-9. (*Id.* 14:12–14). Ike also allegedly contacted the counsel and administrators for the Opioid Settlement Trust asserting that distributions should be directed to the new account. (*Id.* 14:14–15). Plaintiffs argue that Ike provided these individuals with a copy of the Director's Decision to change the information on file. (*Id.* 14:16). And while the propriety of Plaintiffs' allegations is outside the scope of this Order, these actions do shed light on Plaintiffs irreparable harm argument. However, these alleged actions have an available legal remedy. The Holley Council has already filed a Complaint with the U.S. Post Office regarding the missing mail and both the Holley Council and Te-Moak Housing Authority could seek legal action on their remaining allegations.

Because there are adequate legal remedies available to Plaintiffs and Intervenor Te-Moak Housing Authority, the Court does not find that they have met their burden of establishing irreparable harm.

### C. Balance of Hardships and Public Interest

The Court finds that the balance of hardships may tip sharply in favor of Plaintiffs but public interest weighs against Plaintiffs. When the Government is the non-moving party, the balance of hardships and public interest factors merge. *Nken*, 556 U.S. at 435. "The public interest analysis for the issuance of [injunctive relief] requires [district courts] to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Cottrell*, 632 F.3d at 1138 (citation omitted). "The public interest inquiry primarily addresses [the] impact on non-parties rather than parties." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002).

Plaintiffs argue that the balance of hardships "weighs sharply" in their favor because the Garcia-Ike Council has not "demonstrate[ed] that any harm will result to them if a stay [or preliminary injunction] is granted." (Mot. Prelim. Inj. 24:18–21). Plaintiffs argue competing elections cause them hardship, but as explained above, essentially all registered tribal voters may vote in both elections or file an appeal on Sunday. Moreover, Plaintiffs argued at the Hearing that hardship in the form of unnecessary delay will occur to them because there are not enough candidates in the October 12, 2024, election. (Oct. 4, 2024, Hr'g). They explained that "in order to constitute a valid number of a band council, you have to have at least seven council members. The Tuesday election has a sufficient number of candidates." (*Id.*). But a lack of candidates could happen in any election, regardless of whether an internal tribal dispute was ongoing. In fact, the Tribe provides a remedy for filling vacant Band Council seats via their Election Ordinance. (Election Ordinance §13-4-2, Ex. 7 to App. to Mot. Prelim. Inj.).

Plaintiffs and Intervenor Te-Moak Housing Authority argue that the Garcia-Ike Council is abusing its limited authority. (Mot. Prelim. Inj. 24:13–15); (Te-Moak Housing Auth. Mot. Intervene, 14:4–7). It is true that the BIA Decision was limited in scope, only recognizing the Garcia-Ike Counicil on an interim basis, so that the Tribe may resolve their internal disputes through tribal mechanisms. (*See generally*, BIA Decision, Ex. 2 to App. to Mot. Prelim. Inj.). The internal mechanism the BIA Director referred to is a tribal election for which he placed the Garcia-Ike Council in charge of facilitating. (*Id.*). The Court agrees with Plaintiffs and Intervenor Te-Moak Housing Authority that any actions outside of that limited scope would be an abuse of the Decision and add to the hardships Plaintiffs are facing.

As to the public interest factor, Plaintiffs argue that the Director's Decision gives "credence and authority to a group of individuals that are disrupting the 2024 elections and imposes a 'government' on the Tribe composed of four individuals with no legitimate claim to that role." (Mot. Prelim. Inj. 24:28–25:2). Plaintiffs aver that "public interest favors preserving

tribal sovereignty and preventing federal interference in tribal matters," to which the Court agrees. (Mot. Prelim. Inj. 24:22–23 (citing *Nero v. Cherokee Nation*, 892 F. 2d 1457, 1463 (10th Cir 1989))).  "It is a well-established principal of federal law that intra-tribal disputes should be resolved in tribal forums.  This rule applies with particular force to intra-tribal disputes concerning the proper composition of a tribe's governing body." *Bucktooth v. Acting Eastern Area Director*, 29 IBIA 144, 149 (1996).  It is because of this well-established principal that the Court declines to involve itself with deciding which faction should be recognized as the government of the Tribe under Tribal law.  Defendants argue "the public interest strongly favors that this Court allow the Director's Decision to remain in effect, as that will allow for the upcoming elections to be held to attempt to settle the Tribe's leadership dispute according to tribal law, rather than unilaterally impose Holley and his Council as the Tribe's government." (Resp. 21:24–27).  The Court agrees with Defendants and defers to the BIA's decision to recognize the Garcia-Ike Council for the limited purposes of conducting the 2024 election which the Council has scheduled for Saturday, October 12, 2024.  Moreover, if the Court were to grant Plaintiffs requested relief and returned matters to the status quo by staying the BIA Decision, the Tribe would thus be in appellate limbo pending the appeal of the Regional Director's decision and the Tribe would be without a BIA recognized government.  Additionally, the Tribe would still be embroiled in an inter-tribal dispute over tribal leadership.  Thus, the balance of hardships may tip sharply in Plaintiffs favor but the public interest factor weighs against issuing Plaintiffs their requested preliminary injunction or stay.

Accordingly, while there are serious questions going to the merits, at least two factors— irreparable harm and public interest—weigh against Plaintiffs, and the Court DENIES their request for a preliminary injunction or stay of the Director's Decision.

IV.    **CONCLUSION**

**IT IS HEREBY ORDERED** that McDade (ECF No. 29) and the Te-Moak Housing Authority's Motions to Intervene (ECF No. 32, 33) are **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Stay Undated Decision from Director of the Bureau of Indian Affairs and Motion for Preliminary Injunction, (ECF Nos. 10, 13), are **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Stay Proceedings (ECF No. 22) is **GRANTED** pending the resolution of the Consolidated Appeals before the Assistant Secretary of Indian Affairs.

**IT IS FURTHER ORDERED** that the Parties are to file a Joint Status Report on November 1, 2024, and every 28 days thereafter, apprising the Court of whether the stay should remain or be lifted.

**DATED** this ___7___ day of October, 2024.

_____

Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT